**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**JRS LTD.,**

                                        **Plaintiff,**

    **vs.**                                                **1:25-CV-730**
                                                                        **(MAD/PJE)**

**ACE AMERICAN INSURANCE COMPANY,**

                                        **Defendant.**

---

**APPEARANCES:**                                        **OF COUNSEL:**

**COHEN ZIFFER FRENCHMAN**                **CHELSEA IRELAND, ESQ.**
**& MCKENNA LLP**                                **KENNETH H. FRENCHMAN, ESQ.**
1325 Avenue of the Americas, 31st Floor
New York, New York 10019
Attorneys for Plaintiff

**FORAN GLENNON PALANDECH**                **CHARLES J. ROCCO, ESQ.**
**PONZI & RUDLOFF**                        **DAWN M. BREHONY, ESQ.**
40 Wall Street, 54th Floor
New York, New York 10005
Attorneys for Defendant

**CLYDE & CO US LLP**                        **GARION T. LIBERTI, ESQ.**
2 Grand Central Tower
140 East 45th Street, 26th Floor
New York, New York 10017
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On June 9, 2025, JRS Ltd. ("Plaintiff"), as assignee of nonparty Gravity Renewables, Inc. ("Gravity"),[1] brought this diversity action against ACE American Insurance Company ("Defendant") for breach of an insurance agreement.  *See* Dkt. No. 1.  The complaint lists three causes of action: (1) breach of contract – property damage; (2) breach of contract – business interruption; and (3) consequential damages.  *See id.*

On August 7, 2025, Defendant moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff's complaint is untimely.  *See* Dkt. No. 12. Plaintiff opposed the motion on September 3, 2025, *see* Dkt. No. 18, and Defendant filed a reply on September 19, 2025, *see* Dkt. No. 21.  For the following reasons, Defendant's motion is denied.

## II. BACKGROUND

This action arises out of a large-scale operational failure at Gravity's Dahowa Hydroelectric Plant ("the Plant"), a renewable energy facility in Greenwich, New York.  *See* Dkt. No. 1 at ¶¶ 1-3.  The Plant uses waterflow to generate electricity and relies on "various gates and seals" to control the waterflow.  *Id.* at ¶ 13.  Two of the apparatuses are tailwater gates and turbine blade seals.  *See id.*

Plaintiff alleges that "[i]n December 2020, several turbine blade seals failed, allowing river water to contaminate the hydraulic power unit . . . system."  *Id.* at ¶ 14.  Because of the failure, Gravity shut down the Plant for an emergency repair.  *See id.*  During the emergency repair, "Gravity discovered that the tailwater gates were not sealing properly[.]"  *Id.* at ¶ 15.  The

---

[1] As alleged in the complaint, on December 4, 2024, Plaintiff, Gravity, and a third party executed an agreement that assigned Gravity's insurance policy claims to Plaintiff.  *See* Dkt. No. 1 at ¶¶ 88-91.  Defendant does not dispute that Plaintiff is the real party in interest with respect to this action or otherwise question Plaintiff's status as a proper litigant.  *See id.* at ¶ 91; *see also* Dkt. No. 12-1.

emergency repair was finished by January 2021, but Gravity determined that further investigation and repairs were needed.  *See id.* at ¶¶ 14-16.  Gravity decided to have commercial divers investigate the problem.  *See id.* at ¶ 16.  The dive was postponed until August 2021, when water temperatures and river flows were expected to be safer for the divers.  *See id.* at ¶ 18.

To facilitate the August 2021 investigation and repairs, Gravity needed to dewater the Plant.  *See id.* at ¶ 19.  The divers installed custom aluminum sealing plates on September 9, 2021.  *See id.* at ¶ 21.  However, problems persisted because a drain line was clogged with sediment.  *See id.* at ¶ 22.  The drain line was cleared on October 7, 2021.  *See id.* at ¶ 23.  The divers eventually completed the seal after several safety-related delays, and the dewatering process began on November 10, 2021.  *See id.* at ¶ 26.

On January 12, 2022, Gravity was able to inspect the tailwater gate chambers for the first time since the Plant's construction in 1991.  *See id.* at ¶ 33.  The inspection revealed that decades of concrete cracking and deterioration caused the seal issues.  *See id.* at ¶¶ 34-35.  Gravity developed a repair plan, completed the necessary repairs, and returned the Plant to service on May 25, 2022.  *See id.* at ¶¶ 36-37.

Plaintiff alleges the Plant was inoperable from August 2021 through May 2022, and due to the shutdown, Gravity incurred at least $1,668,313 in repair costs.  *See id.* at ¶¶ 2, 39.  Additionally, Plaintiff claims that Gravity lost at least $3,905,192 of income during that period.  *See id.* at ¶ 39.  Gravity had purchased an insurance policy (the "Policy") from Defendant for these types of losses, and the Policy was in effect during the relevant period.  *See id.* at ¶¶ 40-41.  Gravity notified Defendant of its claim for coverage under the Policy, *see id.* at ¶ 52, and Plaintiff alleges that after a "protracted and frustrating investigation[,]" Defendant paid "less than half of the total covered loss to which Gravity was entitled[,]"*id.* at ¶ 53.

According to the complaint, Defendant appointed Sedgwick CMS ("Sedgwick") as its claim adjuster to investigate Gravity's purported loss. *See id.* Sedgwick began its investigation on March 3, 2022. *See id.* at ¶ 54. Approximately one month later, on April 4, 2022, Sedgwick sent a letter on Defendant's behalf summarizing Defendant's understanding of the loss. *See id.* at ¶ 55 (quoting Dkt. No. 1-2 at 2). Defendant also hired an engineering firm and an accounting firm to assist with its investigation. *See id.* at ¶ 57 (quoting Dkt. No. 1-2 at 2).

In May 2023, more than a year later, Defendant valued Gravity's claim at approximately $1,444,897. *See id.* at ¶ 59. After Defendant and Gravity executed proofs of loss as to that amount, Defendant paid Gravity $1,176,802 (the valuation amount, minus deductibles). *See id.* at ¶¶ 60-61.

Three months later, in August 2023, Sedgwick wrote to Gravity on Defendant's behalf with an update on the investigation and additional coverage. *See id.* at ¶ 62. Sedgwick informed Gravity that the Policy covered some of the claimed property damage, but not all. *See id.* at ¶ 63 (quoting Dkt. No. 1-4 at 2). Sedgwick also stated that "'the period of interruption should be limited to 80-days.'" *Id.* (quoting Dkt. No. 1-4 at 2). According to Plaintiff, Sedgwick "assured Gravity that" Defendant had not made a final coverage determination and would "continue its investigation." *Id.* at ¶ 64; Dkt. No. 1-4 at 7. A section of the August 2023 letter labeled "Suit Limitation Period" reads in part: "You requested a 180-day extension of the Policy's suit limitation period. In response to your request, [Defendant's agent] consents to extend the suit limitation 120 days to March 10, 2024, to the extent that it has not yet expired." Dkt. No. 1-4 at 7.

On January 31, 2024, Sedgwick sent another letter as a "supplement" to its August 2023 letter. Dkt. No. 1 at ¶ 65; *see* Dkt. No. 1-5. Therein, Sedgwick reiterated Defendant's position regarding which costs were covered and agreed to increase the interruption period to 88 days. *See*

4

Dkt. No. 1 at ¶ 65 (citing Dkt. No. 1-5 at 2-3). Sedgwick re-confirmed that the investigation was ongoing. *See id.* at ¶ 66; *see* Dkt. No. 1-5 at 4.

On June 10, 2024, Sedgwick sent a letter with what Plaintiff considers to be Defendant's "final coverage position." Dkt. No. 1 at ¶ 67; Dkt. No. 1-6. That coverage position provided for an additional property damage payment of $134,386 and an additional business interruption payment of $145,893. *See* Dkt. No. 1 at ¶ 68; Dkt. No. 1-6 at 4. The parties executed an updated proof of loss on July 10, 2024. *See* Dkt. No. 1 at ¶ 68; Dkt. No. 1-7. Plaintiff alleges that Defendant undervalued the covered costs by more than $700,000.[2] *See* Dkt. No. 1 at ¶ 69 (citing Dkt. No. 1-7).

The parties disagree on (1) which part of their insurance agreement governs the applicable suit limitation period; and (2) when the limitation period began. *See* Dkt. Nos. 12-1, 18, 21. The parties' arguments rely on limitation periods mentioned in the Policy and related documents. *See* Dkt. Nos. 12-1, 18, 21. Plaintiff appended the Policy to its complaint and opposition to Defendant's motion to dismiss. *See* Dkt. Nos. 1-1, 18-1. The relevant provisions include the Policy's Property All Risk Insurance ("PARI") part and Commercial Property Conditions ("CPC") part, as well as a New York-specific endorsement. *See* Dkt. Nos. 12-1, 18; *see also* Dkt. Nos. 1-1, 18-1. Also at issue is a document labeled "Legal Liability Coverage Form" (the "Form"), which Defendant attached as an exhibit to its motion. *See* Dkt. No. 12-3; *see also* Dkt. No. 1-1 at 85.

The text of the CPC part requires lawsuits to be brought "within 2 years after the date on which the direct physical loss or damage occurred." Dkt. No. 1-1 at 9. The Legal Liability

---

[2] Because Defendant argues for dismissal on timeliness grounds only, *see* Dkt. No. 12-1, the Court will not summarize in detail the computation of the loss amounts.

Coverage Form states that "[v]arious provisions in this policy restrict coverage."  Dkt. No. 12-3 at 2.  The Form does not include a specific statute of limitations, but contains a section titled "Legal Action Against Us."  *Id.* at 4.  The New York endorsement also includes a "Legal Action Against Us" provision and states as follows: "No person or organization has a right under this Coverage Form: a. To join us as a party or otherwise bring us into a 'suit' asking for damages from you; or b. To sue us on this Coverage Form unless all of its terms have been fully complied with."  Dkt. No. 18 at 10 (quoting (Dkt. No. 1-1 at 85).

Plaintiff argues that the New York endorsement modifies the CPC part by removing the two-year suit limitation and opposes introduction of the Form.  *See id.* at 14-18.  Plaintiff contends the endorsement "replaces the CPC Section's Suit Limitation Clause and removes any contractual requirement to bring suit against ACE within a specific time period."  *Id.* at 10.  Defendant argues that the two-year CPC limitation period applies because the endorsement modifies the Form, not the CPC part.  *See* Dkt. No. 12-1 at 9-10; Dkt. No. 21 at 5-6.  Defendant avers the Form "is not part of the Policy."  Dkt. No. 12-1 at 10.  Defendant also argues that the "endorsement specifically states that it applies only to the Legal Liability Coverage Form."  Dkt. No. 21 at 5.

However, Plaintiff contends that none of this matters.  Plaintiff argues that, regardless of which document the New York endorsement modifies, the CPC part does not provide the governing statute of limitations.  *See* Dkt. No. 18 at 20-21.  Instead, Plaintiff advocates for an entirely separate limitation period set forth in the PARI part.  *See id.*  The PARI part of the Policy requires a party to sue "within twelve (12) months from the date of the Occurrence[,]" Dkt. No. 1-1 at 23, with "occurrence" defined as "any loss or series of losses arising out of one event[,]" *id.* at 31.

Defendant argues that, even if the PARI part applies, the date Plaintiff proposes as beginning the statute of limitations is incorrect. *See* Dkt. No. 21 at 8-10. Plaintiff seeks to rely on the date Defendant denied insurance coverage, *see* Dkt. No. 18 at 23-27; whereas Defendant seeks to rely on the date damage occurred at the Plant, *see* Dkt. No. 21 at 8-10.

### III. DISCUSSION

**A.    Motion to Dismiss Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of the pleader's claim for relief. *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, courts may still consider documents attached to the pleading as an exhibit or incorporated by reference into the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)). A court may also consider documents that are "integral" to the pleading, even if they are not physically attached or incorporated by reference. *Id.* (quoting *Chambers*, 282 F.3d at 152-53).

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Additionally, "[w]hen documents attached to the complaint as exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true." *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370 (N.D.N.Y. 2019), *partial*

*reconsideration granted*, No. 5:18-CV-701, 2020 WL 5027241 (N.D.N.Y. Aug. 25, 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 510-511 (2d Cir. 2007)) (other citations omitted). To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim[,]" *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). A complaint that "pleads facts that are 'merely consistent with' a defendant's liability" generally does not meet the pleading standard. *Id.* (quoting *Twombly*, 550 U.S. at 557).

Further,

> Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone[,] or it may convert the motion to one for summary judgment under [Federal Rule of Civil Procedure] 56 and afford all parties the opportunity to present supporting material.

*Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988). "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court," the court must convert the motion into one for summary judgment. FED. R. CIV. P. 12(d). Conversion is not required if the court disregards the extrinsic material. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

**B.    Consideration of Extrinsic Document**

8

Before the Court can analyze the parties' arguments regarding the applicable statute of limitations, it must determine whether to consider a document introduced with Defendant's motion: the Legal Liability Coverage Form. *See* Dkt. No. 12-3. All the other relevant documents were submitted as exhibits to the complaint. If the Court deems the Form extrinsic evidence and chooses to consider it, the Court must convert Defendant's motion to dismiss into a motion for summary judgment. *See Looby v. Safeco Nat'l Ins. Co.*, No. 1:25-CV-533, 2025 WL 3467652, *2 (N.D.N.Y. Dec. 3, 2025) (quoting FED. R. CIV. P. 12(d)). The Court may also choose not to consider the Form and decide the motion under the Rule 12(b)(6) standard. *See id.* (citing *Cleveland*, 448 F.3d at 521). The Court has discretion on which approach to take, and "[t]he 'essential inquiry[]' . . . is whether the parties 'should reasonably have recognized the possibility that the motion might be converted to one for summary judgment or [whether they were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading." *Garcha v. City of Beacon*, 351 F. Supp. 2d 213, 216 (S.D.N.Y. 2005) (quoting *In re G. & A. Books, Inc.*, 770 F.2d 288, 294-95 (2d Cir. 1985)) (other citation omitted).

The Form is not mentioned in the complaint.[3] *See* Dkt. No. 1. The Form is not attached to the complaint, nor does the complaint rely on it so pervasively as to render the Form integral to the complaint. *See* Dkt. Nos. 1, 1-1. Thus, the Form is not part of the pleadings, and the Court must decide whether to consider the Form as extrinsic evidence and convert the motion.

Defendant contends "the Legal Liability Coverage Form was only included as an exhibit for illustrative purposes. It was not submitted to resolve ambiguity in the Policy, nor does it affect the substantive interpretation of the Policy." Dkt. No. 21 at 7. Defendant claims it

---

[3] In its motion to dismiss, Defendant notes that the Form is referenced in Exhibit 1 to the complaint. *See* Dkt. No. 12-1 at 10 n.5. The complaint itself does not make any allegations regarding the Form.

introduced the Form, "which is not part of the Policy," to show that the Form would have been modified by the New York endorsement. *Id.*

Both parties acknowledge the possibility of Defendant's motion to dismiss being converted to a motion for summary judgment and had the opportunity to submit extrinsic evidence with their motion papers. *See* Dkt. No. 18 at 18; Dkt. No. 21 at 7. However, the motion papers focus primarily on the issue of timeliness and rely on various provisions within the Policy. Because Defendant expressly states the Form is not intended to influence the Court's interpretation of the Policy or resolve any potential ambiguities, Defendant appears to admit that the Form is unnecessary to the Court's resolution of its motion. This admission, coupled with the limited availability of evidence because discovery has not yet occurred, supports a decision not to consider the Form and to refrain from converting the motion to dismiss into a motion for summary judgment. *See Islip U-Slip LLC v. Gander Mountain Co.*, 2 F. Supp. 3d 296, 305 (N.D.N.Y. 2014) (declining to convert a motion to dismiss into a motion for summary judgment because "conversion would not be 'likely to facilitate the disposition of the action'") (quoting *Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07-CV-596, 2008 WL 728896, *2 (E.D.N.Y. 2008)); *Wajilam Exps. (Sing.) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006) ("There would be little point in considering a summary judgment motion when significant relevant facts may yet be discovered").

Accordingly, the Court declines to consider the Legal Liability Coverage Form and proceeds under the Rule 12(b)(6) standard.

## C.    Contract Interpretation Under New York Law

"[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996). Courts in this circuit have

previously followed state substantive law when deciding diversity cases involving insurance policy disputes, including with regard to statutes of limitation. *See Endemann*, 390 F. Supp. 3d at 370-71 & n.2 (collecting cases); *Looby*, 2025 WL 3467652, at *3. The Court does the same here, as the insured property is located in New York, *see* Dkt. No. 1 at ¶ 1, and both parties apply New York substantive law in their motion papers, *see* Dkt. No. 12-1 at 7-8 (referring to New York law regarding time limitations in insurance policy disputes); Dkt. No. 18 at 24-27 (same).

"For a defendant to prevail on a motion to dismiss for breach of contract, the contract must unambiguously support the defendant's position." *Pro. Fighters League, LLC v. Takeover Indus., Inc.*, 770 F. Supp. 3d 718, 724 (S.D.N.Y. 2025) (citation and internal quotation marks omitted). Although courts are not required to "accept the allegations of the complaint as to how to construe a contract, they should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Id.* (citation and internal quotation marks omitted). "[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

In insurance coverage disputes, New York law requires that courts "first look to the language of the policy[.]" *Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co.*, 98 N.Y.2d 208, 221 (2002) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 354-55 (1978)). A court must construe an insurance policy "in a way that 'affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'" *Id.* at 221-22 (quoting *Hooper Assocs., Ltd. v. AGS Computs., Inc.*, 74 N.Y.2d 487, 493 (1989)). Courts are to interpret insurance policies "liberally in favor of the insured and strictly against the insurer." *Penna v. Fed. Ins. Co.*, 28 A.D.3d 731, 731 (2d Dep't 2006) (citing *Gov't Emps. Ins. Co.*

11

*v. Kligler*, 42 N.Y.2d 863, 864 (1977)).  They must also read endorsements together with the policy they purport to modify.  *See id.* at 731-32 (quoting *Cnty. of Columbia v. Cont'l Ins. Co.*, 83 N.Y.2d 618, 628 (1994)) (other citations omitted).  "The Court . . . need not follow the literal meaning of the language used if doing so would, based on the structure and purpose of the agreement, produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectation of the parties."  *Pro. Fighters League*, 770 F. Supp. 3d at 725 (citation and internal quotation marks omitted); *see also Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-CV-7134, 2015 WL 4940126, *5 (S.D.N.Y. Aug. 10, 2015).

The presence of ambiguity in a contract "is a threshold question of law to be determined by the court."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co*, 411 F.3d 384, 390 (2d Cir. 2005).  A contract is ambiguous when its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Id.* (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)); *see also Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326-27 (1996) ("[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy . . . and employing common speech") (citations omitted).  Applying New York law, the Second Circuit has characterized "ambiguity" as "the inadequacy of the wording to classify or characterize something that has potential significance."  *Eternity*, 375 F.3d at 178.

### 1.  *Policy Provision Governing Suit Limitation Period*

Before determining if Plaintiff's complaint was timely filed, the Court must address the parties' dispute over which section of the Policy applies to the underlying insurance claim: the

PARI coverage part or the CPC coverage part. *See* Dkt. No. 18 at 20 (Plaintiff stating that the claim "falls within the Policy's All-Risk Coverage"); Dkt. No. 21 at 8 (Defendant questioning Plaintiff's "strange claim that the coverage in dispute is not in fact commercial property insurance coverage"). Defendant's motion to dismiss—which is substantively eight pages in length—appears to assume the CPC part applies, *see* Dkt. No. 12-1 at 9, but Plaintiff argues "[t]here is no dispute" that the PARI part governs, Dkt. No. 18 at 20. Defendant reiterates its contrary position in its reply. *See* Dkt. No. 21 at 8. Much of the parties' disagreement concerns the New York endorsement and whether it changes the CPC part's two-year suit limitation. *See* Dkt. No. 12-1 at 9-10; Dkt. No. 18 at 14-17; Dkt. No. 21 at 5-6. However, as explained below, because the PARI part plausibly applies, the Court need not reach the New York endorsement dispute.

At the motion to dismiss stage, the Court must look to the pleadings and their attached exhibits, drawing all reasonable inferences in Plaintiff's favor. Based on the Court's review of the pleadings, Plaintiff plausibly alleges coverage under the PARI part of the Policy. For example, the complaint states that "[u]nder the Policy's Property All Risk Insurance Form[,]" ACE guaranteed insurance coverage to Gravity. Dkt. No. 1 at ¶ 42. The complaint never mentions the CPC part. Additionally, Sedgwick's letters dated April 4, 2022, August 11, 2023, January 31, 2024, and June 10, 2024, which are attached to Plaintiff's complaint, quote the PARI part in discussing Defendant's coverage positions. *See* Dkt. No. 1-2 at 3-6; Dkt. No. 1-4 at 4; Dkt. No. 1-5 at 2-3; Dkt. No. 1-6 at 3. Despite Sedgwick's letters, Defendant argues in conclusory fashion that because "Gravity purchased the instant Policy to provide all-risk coverage to Gravity's commercial property[,]" the CPC part is the source of coverage. Dkt. No. 21 at 8. Defendant's argument for the application of the CPC part's limitation clause rests on that premise. That argument, at this stage, however, does not negate Plaintiff's allegations that the PARI part applies.

13

The text of the Policy does not definitively clarify which part governs.  The PARI part "insures against all risks of direct physical loss or damage to Property Insured from perils not otherwise excluded," has an endorsement extending coverage to "loss directly resulting from the necessary interruption of business incurred by the Insured during the Period of Interruption[,]" and identifies various types of real and personal property as eligible for coverage.  Dkt. No. 1-1 at 12-13, 33.  By its terms, the CPC part appears to apply to commercial property.  *See id.* at 9.  Defendant contends that Gravity's insured property is commercial property and therefore covered by the CPC part.  *See* Dkt. No. 21 at 8.

The Policy's declarations, which are attached to the complaint with the Policy, state that coverage is provided "as per forms and endorsements attached."  Dkt. No. 1-1 at 3.  They also include a notation that reads: "Forms and endorsements attached to policy at inception: Common Policy Conditions . . . , *Commercial Property Conditions* . . . , OFAC Advisory Notice to Policyholders . . . ."  *Id.*  At the very least, that notation appears to show that at the Policy's inception, the CPC part and provisions other than the PARI part provided Gravity's coverage.  It is not clear from the Policy, however, whether that notation is meant to say that forms and endorsements added later have no effect.  Such a reading would make little sense, as it would disregard the PARI part and dozens of exclusions and endorsements now appended to the Policy—including the New York endorsement.  *See* Dkt. No. 1-1.  Thus, the Policy's declarations offer no meaningful clarification.

Construing Plaintiff's factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court determines that Plaintiff has pled adequate facts suggesting that the PARI part applies.  The Policy does not unambiguously support Defendant's position that the CPC part provided Gravity's coverage and the applicable suit limitation.  Thus, for purposes of

deciding the motion to dismiss, the Court examines the parties' timeliness arguments only under the PARI part's suit limitation provision.

### 2. Timeliness of Plaintiff's Complaint

"Although New York's general statute of limitations for breach-of-contract claims is six years, 'New York [c]ourts have consistently allowed parties, by written agreement, to impose a shorter period within which to commence an action than that provided by statute[,] so long as the agreed upon limitation is reasonable.'" *Looby*, 2025 WL 3467652, at \*3 (quoting *Endemann*, 390 F. Supp. 3d at 370-71) (other citation omitted).  Plaintiff's preferred limitation period comes from the Policy's PARI coverage part.  *See* Dkt. No. 18 at 20.  Defendant's motion addresses this limitation period only in a footnote, *see* Dkt. No. 12-1 at 9 n.4, but its reply offers a fuller argument of why it believes the claim is untimely under the PARI provision, *see* Dkt. No. 21 at 8-11.  The provision reads as follows:

> **B. Action Against Company**
>
> No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, and unless commenced within twelve (12) months from the date of the Occurrence.

Dkt. No. 1-1 at 23.  The PARI part defines "Occurrence" as follows:

> **E. Occurrence**
>
> The term Occurrence shall mean any loss or series of losses arising out of one event, regardless of the number of locations affected. However, as respects the perils of Earth Movement and Flood, the term Occurrence shall mean the sum total of all the losses sustained by the Insured as the result of damage from Earth Movement or Flood which arise during a continuous period of seventy-two (72) hours.  The Insured may elect the moment from which each of the aforesaid periods of seventy-two (72) hours shall commence; but no two such seventy-two (72) hour periods shall overlap.

15

> Occurrence shall not mean "continuous or repeated exposure to conditions" unless physical loss or damage insured against by this policy ensues, and then this policy shall only cover such ensuing loss or damage; nor shall Occurrence mean "loss of use of tangible property that has not been physically injured or destroyed."

*Id.* at 31. The PARI part does not expressly define "loss" or "event."[4] The parties advance different interpretations of the "occurrence" definition and, by extension, identify different dates when the limitations period began to run. Plaintiff claims that it needed to bring a lawsuit within twelve months from the date that Defendant denied coverage, which Plaintiff identifies as June 10, 2024. *See* Dkt. No. 18 at 24-27. On the other hand, Defendant argues that the twelve-month period began running on the date that damage occurred, which Defendant identifies as November 10, 2021. *See* Dkt. No. 21 at 8-10.

### a. *Limitation Period Starting at Time of Damage – Defendant's Interpretation*

In arguing that the limitation period began on November 10, 2021, the purported date of damage, Defendant argues that Plaintiff's reliance on the date coverage was denied ignores the term "occurrence" in the PARI part and "results in an absurd reading" of the Policy. Dkt. No. 21 at 9. Defendant cites a Second Circuit case for the proposition that, unless an insurance policy specifies otherwise, courts should ascribe ordinary meanings to words in the policy. *See id.* (citing *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986)).

---

[4] The PARI part defines "Earth Movement" as "any natural or man-made earth movement, including, but not limited to, earthquakes, shocks, tremors, landslides, avalanches, subsidence, sinkhole collapse, mud flow, rock fall, volcano, or any other similar earth movement[,]" and "Flood" as:

> flood waters, waves, tide or tidal water, storm surge, tsunami, the release of water, the accumulation of rain or surface water, or the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams or other natural or man-made bodies of water, whether or not driven by wind.

Dkt. No. 1-1 at 30. Neither party contends that any of these conditions occurred.

In *Newmont Mines*, the Second Circuit applied New York law and interpreted the term "occurrence" by looking first to the dictionary definition. *Newmont Mines*, 784 F.2d at 135. The insurance policy in that case did not define the term. Rather, as summarized by the Second Circuit: "[t]he term 'occurrence' ordinarily is understood to denote 'something that takes place,' especially 'something that happens unexpectedly and without design.'" *Id.* (citations omitted). The Second Circuit also noted that "the meaning of 'occurrence' must be interpreted in the context of the specific policy and facts of th[e] case[,]" *id.* at 136 n.9, and distinguished use of the term in liability insurance policies from its use in property damage insurance policies, *see id.* at 135-37. Under a property damage insurance policy, like the one here, the Second Circuit stated that "[t]he goal . . . is to provide financial protection against damage to property." *Id.* at 136. The Second Circuit construed the term as referring to each individual instance of damage to the insured property, "unless the damage occurring at one point in time was merely part of a single, continuous event that already had caused other damage." *Id.* at 136-37 (footnote omitted).

A similar interpretation is plausible here. Reading "occurrence" as referring to physical damage comports with the Second Circuit's reasoning in *Newmont Mines*, as well as the Policy's mentions of natural disasters in its definition of "occurrence." Through this lens, Defendant pinpoints November 10, 2021, as the date the limitation period started running. *See* Dkt. No. 12-1 at 9; Dkt. No. 21 at 9. According to the complaint, divers repaired a critical seal issue and dewatering of the Plant began on that date. *See* Dkt. No. 1 at ¶ 26. Under Defendant's interpretation, the PARI suit limitation period expired on November 10, 2022, more than two-and-a-half years before Plaintiff filed suit. *See* Dkt. No. 21 at 9. However, if Plaintiff's interpretation of the PARI suit limitation is also plausible and would render the action timely, Defendant's motion must be denied. *See Pro. Fighters League*, 770 F. Supp. 3d at 724 (stating

17

that for the court to grant a motion to dismiss, "the contract must unambiguously support the defendant's position") (citation omitted); *see also Duane Reade*, 411 F.3d at 390 (stating that a contract is ambiguous when a "reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" could interpret its terms more than one way) (citation and internal quotation marks omitted).

### b.  *Limitation Period Starting at Time of Coverage Denial – Plaintiff's Interpretation*

Plaintiff argues that the limitation period began not at the time of physical damage, but when Defendant denied coverage.  *See* Dkt. No. 18 at 24.  Citing New York and federal caselaw, Plaintiff contends that, unless an insurer uses "'exceptionally clear' and 'highly specific' language to 'tie a limitations period to the date of the accident or peril insured against[,]'" the default rule is that the clock starts when the insurer refuses to pay.  *Id.* (quoting *GEICO Marine Ins. Co. v. Mandel*, No. 19-CV-3107, 2020 WL 6318948, *7 (E.D.N.Y. Sept. 18, 2020), *R. & R. adopted*, 2020 WL 5939186 (E.D.N.Y. Oct. 7, 2020)) (other citations omitted).  Plaintiff's position is that the PARI suit limitation is worded generically, which triggers the default rule.  *See* Dkt. No. 18 at 25-26.  In opposition, Defendant argues that the Policy's language is sufficiently specific to override the default rule.  *See* Dkt. No. 21 at 9-10.

"[T]he New York Court of Appeals [has] held that generic language setting a contractual limitations period should be interpreted to start the clock not at the time of the accident itself[,] but only once 'the right to bring an action exists . . . .'"  *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 91 (2d Cir. 2010) (quoting *Steen v. Niagara Fire Ins. Co.*, 89 N.Y. 315, 323 (1882)) (other citation omitted).  The right to bring an action often arises when payment on a claim "becomes

due and enforceable." *Id.* at 93 (citing *Steen*, 89 N.Y. at 324). In other words, "unless the contract provides otherwise, a cause of action for breach of an insurance contract accrues at the time of breach under New York law." *Id.* (citing *Med. Facilities, Inc. v. Pryke*, 62 N.Y.2d 716, 717 (1984)).

In *Fabozzi*, the Second Circuit recognized the phrase "'after the inception of the loss[,]'" or similar language, as a sufficiently specific "term of art which fixes the limitations period to the date of the incident." *Id.* at 91. Likewise, an express, precise statement that the limitation period starts running at the time of physical loss or damage overcomes the default rule. *See id.* at 92 (citing *Myers, Smith & Granady, Inc. v. N.Y. Prop. Ins. Underwriting Ass'n*, 85 N.Y.2d 832 (1995)). For example, a provision requiring a lawsuit to be brought "'within two years after the date on which the direct physical loss or damage occurred'" is sufficiently specific to start the limitation period at the time of damage. *Id.* (quoting Brief for Defendant-Respondent, *Myers, Smith & Granady*, 85 N.Y.2d 832, 1994 WL 16045369, at *11).

Conversely, a suit limitation stating the following is considered generic and subject to the default rule: "No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss." *Id.* at 90; *see also Mercedes-Benz Fin. Servs. USA, LLC v. Allstate Ins. Co.*, 162 A.D.3d 1183, 1184 (3d Dep't 2018) (holding that a policy provision requiring lawsuits to be brought "within one year after the date of loss" is generic and starts the limitation period when the insurer denies coverage) (emphasis removed); *Lobello v. N.Y. Cent. Mut. Fire Ins. Co.*, 152 A.D.3d 1206, 1208-09 (4th Dep't 2017) (holding, based on the distinction between loss and inception of loss, that a requirement to sue "'within two years after the date of loss'" is generic and starts the clock at the time coverage is denied). To depart from

19

the default rule, the Court must find "an unmistakable intention" to start the limitation period at the time of physical loss. *Mercedes-Benz*, 162 A.D.3d at 1184-85 (collecting cases).

Here, the contested suit limitation requires commencement of legal action "within twelve (12) months from the date of the Occurrence[,]" Dkt. No. 1-1 at 23, with "Occurrence" defined as "any loss or series of losses arising out of one event, regardless of the number of locations affected[,]" *id.* at 31. Thus, the suit limitation can be construed as requiring a lawsuit to be brought within twelve months of any loss or series of losses arising out of one event.

In arguing that this language is not generic, and therefore permits a departure from the default rule, Defendant cites numerous cases which found that suit limitation language referencing "the occurrence *causing* loss or damage" was sufficiently specific to start the clock at the time of damage. Dkt. No. 21 at 10 (citing *Keita v. Am. Sec. Ins. Co.*, No. 17-CV-879, 2021 WL 5865734, *2 (E.D.N.Y. Dec. 10, 2021); *Ciobanu v. State Farm Fire & Cas. Co.*, No. 21-CV-288, 2022 WL 889024, *5 (E.D.N.Y. Mar. 25, 2022); *Franco Apparel Grp., Inc. v. Nat'l Liab. & Fire Ins. Co.*, No. 10-CV-8205, 2011 WL 2565287, *3 (S.D.N.Y. June 28, 2011)) (emphasis added). In *Franco Apparel Group*, the Southern District stated that "the word 'loss' is ambiguous standing alone, because it can refer either to the damage incurred or to the accrual of the claim." *Franco Apparel Grp.*, 2011 WL 2565287, at *3 (citing *Fabozzi*, 601 F.3d at 93). Including the word "inception" or some similar term in the policy definition "clarifies that the 'loss' at issue is the first of the two meanings[.]" *Id.*

Defendant relies on this reasoning to argue that "[r]eading the term 'occurrence' to mean the date of denial renders the provision incoherent." Dkt. No. 21 at 10. Defendant's interpretation, however, does not address an important point that Plaintiff makes: "As written, the limitation period runs from the date of the 'loss' rather than the 'event' . . . ." Dkt. No. 18 at 25. In

20

other words, by its plain language, the suit limitation ties the start of the period to the loss or series of losses arising out of a certain event, not the event itself. *See id.* Thus, the instant suit limitation is distinguishable from those in Defendant's cited cases. The insurance policies in those cases tied the limitation period to the event(s) giving rise to the loss or damage, which is not what the PARI suit limitation can plausibly be interpreted to prescribe. Therefore, the Court disagrees with Defendant that construing "occurrence" as referring to the date of denial renders the provision incoherent. The provision can reasonably be read to state that a party must bring its suit within twelve months of the loss (denial of coverage) stemming from an event (the physical damage).

However, the analysis does not end there. The parties dispute the date that Defendant denied coverage and, by extension, whether the action is timely under this understanding of the suit limitation. *See id.* at 26-27; Dkt. No. 21 at 11. Plaintiff asserts that the limitation period began on June 10, 2024, when Defendant "confirmed its final partial payment and denied coverage for the remainder of Gravity's claim" in a letter from Sedgwick. Dkt. No. 18 at 26; *see* Dkt. No. 1 at ¶ 67 (alleging that Defendant stated its final coverage position on June 10, 2024). Defendant contends that, under the PARI suit limitation, the clock started running on January 31, 2024. *See* Dkt. No. 21 at 11. On that date, Defendant sent a letter explaining its coverage position and stating that its investigation would continue. *See* Dkt. No. 1-5 at 4. Defendant argues that it provided its *final* coverage position via letter on that date because the June 10, 2024, letter did not change its position. *See* Dkt. No. 21 at 11. Rather, according to Defendant, the June letter was simply "a response to a letter from Gravity asking ACE to reconsider its position[,]" in which it declined to reconsider and reiterated its denial. *Id.*

21

Defendant's argument does not undermine Plaintiff's factual allegations. The complaint alleges that Defendant sent the January letter to "supplement" a letter it sent in August 2023, and had not yet made a coverage determination. Dkt. No. 1 at ¶¶ 65-66. Defendant's January letter, which is considered part of the pleadings, contains an invitation for Gravity to write back with any objections to Defendant's coverage position. *See* Dkt. No. 1-5 at 4. The letter notes that the investigation was not yet complete as of January 31, 2024, the agencies working on Defendant's behalf "ha[d] made no determination on coverage" at that point, and the letter was meant "to advise [Plaintiff] of potentially applicable Policy provisions in a complete reservation of rights." *Id.* Accordingly, Plaintiff has furnished enough factual allegations for the Court to infer that Defendant had not yet made a final denial of coverage on January 31, 2024.

The June letter explains that Plaintiff responded to Sedgwick regarding the January letter on March 11, 2024. *See* Dkt. No. 1-6 at 1. Sedgwick stated that it "reviewed [Plaintiff's] letter and determined that no new information ha[d] been provided that would alter ACE's coverage position." *Id.* Sedgwick again invited Gravity to write back with any objections to Defendant's coverage position, and stated that "ACE . . . will continue its investigation under a reservation of all rights." *Id.* at 4. Importantly, the complaint specifically alleges that Defendant issued its *final* coverage determination on June 10, 2024. *See* Dkt. No. 1 at ¶ 67. The pleadings therefore permit a reasonable inference that the final coverage determination did not occur prior to that date.

Accordingly, the Court determines that Plaintiff has adequately pled that the twelve-month PARI limitation period started running on June 10, 2024. Thus, to timely file suit, Plaintiff must have commenced this action by June 10, 2025. Plaintiff filed its complaint on June 9, 2025, *see* Dkt. No. 1, which means that under the Rule 12(b)(6) pleading standard, the action survives dismissal on timeliness grounds.

### c. *Suit Limitation Note in the August 2023 Sedgwick Letter*

Defendant notes that in the August 11, 2023, letter, Defendant agreed to Plaintiff's "request to 'extend the [Policy's] suit limitation 120 days to March 10, 2024, to the extent that it has not yet expired.'" Dkt. No. 12-1 at 6 (quoting Dkt. No. 1-4 at 7). Additionally, Defendant argues that Plaintiff's "[c]omplaint is void of any allegations that the suit limitation period was extended so that the lawsuit was timely filed. Thus, Plaintiff's lawsuit is time-barred, and should be dismissed." *Id.* at 9. Plaintiff attached the letter to the complaint; therefore, the Court may consider it. *See* Dkt. No. 1-4. Plaintiff does not address the quoted language regarding an extension in its complaint or its opposition to Defendant's motion. *See* Dkt. Nos. 1, 18.

When a document attached to a complaint as an exhibit contradicts allegations in the complaint, the Court need not accept the complaint's allegations as true. *See Endemann*, 390 F. Supp. 3d at 370 (citing *Roth*, 489 F.3d at 510-11) (other citation omitted); *Brown v. N.Y.C. Hous. Auth.*, No. 05-CV-10332, 2006 WL 1378599, *1 (S.D.N.Y. May 17, 2006) ("[W]here allegations set out in the complaint are contradicted by other matters asserted or by materials attached to or incorporated by reference in the complaint, the Court is not obliged to credit the allegations in the complaint") (citations omitted). The Second Circuit has stated that "the contents of [a] document [considered on a Rule 12(b)(6) motion] are controlling where a plaintiff has alleged that the document contains, or does not contain, certain statements." *Roth*, 489 F.3d at 511. "[S]uch documents may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents." *Id.*

Plaintiff's complaint alleges that the August 2023 letter contains updates on Defendant's coverage position. *See* Dkt. No. 1 at ¶¶ 62-64. Those allegations are uncontradicted; the letter does provide Defendant's coverage position. *See* Dkt. No. 1-4. However, the updates are separate

from the letter's discussion of the applicable limitation period.  The complaint does not make any allegations concerning Plaintiff's apparent extension request or Defendant's approval of such as noted in the letter.  Although that portion of the letter appears to contradict Plaintiff's version of the applicable limitation period, it does not specifically nullify Plaintiff's allegations that support a plausible inference of timeliness under the PARI coverage part.  For example, the August 2023 letter's extension of the suit limitation to March 10, 2024, does not negate Plaintiff's allegation that Defendant sent the June 10, 2024, letter which stated "its *final* coverage position."  Dkt. No. 1 at ¶ 67 (emphasis added).

Likewise, crediting the letter as dispositively true—as Defendant wants the Court to do—and extinguishing Plaintiff's complaint on that basis alone would exceed the Court's scope of review at this stage.  *See Roth*, 489 F.3d at 511 (vacating a district court's dismissal of the plaintiff's complaint because, *inter alia*, the district court improperly deferred to the defendants on issues of fact "that should not have been determined at the pleading stage").  "In the context of a motion to dismiss brought under Rule 12(b)(6), '[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side.'" *Doe v. N.Y. Univ.*, No. 1:20-CV-1343, 2021 WL 1226384, *9 (S.D.N.Y. Mar. 31, 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)).  If the parties indeed negotiated extensions of a suit limitation, and the agreed-upon deadline expired before Plaintiff brought this action, Defendant will have opportunities to introduce such evidence at later stages of the case.

Because the Policy's suit limitation language is ambiguous and Plaintiff's complaint is timely under at least one reasonable interpretation of the Policy, the complaint survives dismissal.

## IV. CONCLUSION

24

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendant's motion to dismiss (Dkt. No. 12) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 26, 2026
      Albany, New York

Mae A. D'Agostino
U.S. District Judge